# In the United States Court of Federal Claims

No. 16-811V
(Originally filed: November 12, 2021)[1]
(Re-issued: May 27, 2026)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TASHA LOYD, Parent and next
friend of C.L., a minor,

        *Petitioner*,

v.

SECRETARY OF HEALTH
AND HUMAN SERVICES,

        *Respondent*.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Richard Gage*, Cheyenne, WY, for petitioner.

    *Tyler King,* Trial Attorney, U.S. Department of Justice, Civil Division, Torts Branch, Washington, DC, with whom were *Brian M. Boynton,* Acting Assistant Attorney General, *C. Salvatore D'Alessio,* Acting Director, *Heather L. Pearlman*, Deputy Director, *Traci R. Patton*, Assistant Director, for respondent.

## OPINION

BRUGGINK, *Judge*.

    Pending is petitioner's motion for review of the Special Master's decision of May 20, 2021, denying compensation under the National Childhood Vaccine Injury Act. The matter is fully briefed, and the court finds that oral argument is unnecessary. Because the Special Master was not

---

[1] This opinion was originally published under seal in 2021 to afford the parties an opportunity to propose any appropriate redactions. None were proposed. The opinion inadvertently remained under seal, however. We now publish it as it appeared in the original.

arbitrary or capricious in determining that petitioner did not meet her burden of proving that the vaccines were causally connected to the alleged injury, we deny the motion for review.

BACKGROUND[2]

I. Factual History

C.L. was born on January 25, 2013 and was largely a healthy baby. Ms. Loyd described C.L. as "healthy, bubbly, active." Tr. 7. During her two-week well-child visit at Westchase Pediatrics in Tampa, Florida, C.L.'s pediatrician, Dr. Laura Heimback-Graham, M.D., noted that petitioner requested a staggered vaccination schedule. C.L. received her first set of vaccinations at her ten-week well-child visit on April 5, 2013, including the haemophilus influenza type b ("Hib"), pneumococcal conjugate (also referred to herein as "PCV" or "Prevnar"), inactivated polio ("IPV"), and diphtheria-tetanus-acellular pertussis ("DTaP") vaccines. Ex. 2 at 9, 11. No adverse reactions were documented.

C.L. returned to Dr. Heimback-Graham on August 7, 2013, for her six-month well-child visit. Following a physical examination that reported nothing abnormal, C.L. received the second dose of the DTaP vaccine as well as the Rotavirus vaccine. Again, no adverse reactions to the vaccinations were documented.

When C.L. was about six months of age, on August 30, 2013, she returned to her pediatrician's office to receive the second doses of the PCV and Hib vaccines. Ex. 2 at 25. After receiving the second doses of the PCV and Hib vaccines, in Ms. Loyd's description, C.L. was feverish and "fussy." Tr. 8. Ms. Loyd also stated that over the next few days after receiving her vaccinations, C.L. became "clingy" and out of sorts. *Id.* at 9. Approximately two weeks after the vaccinations, Ms. Loyd stated that C.L. began displaying bruises. She could not identify any incidents that would lead to the bruising she was observing.

---

[2] The background facts are drawn from the Special Master's opinion and the record below.

Petitioner testified that in September 2013, she began to document the bruising with photographs. She also testified that there were no known incidents that could explain any of the bruising seen in the photographs.

C.L. returned to Dr. Heimback-Graham for a sick visit on January 15, 2014. Petitioner reported a five-day history of fever, cough, congestion, and decreased appetite. A physical examination revealed symptoms consistent with an acute upper respiratory infection. No complaints of abnormal bruising were documented during this visit and no bruising was observed during the physical examination.

On February 3, 2014, at a twelve-month well visit, Laura Heimback-Graham, M.D., C.L.'s primary care physician, ordered a complete blood count ("CBC") for this visit, and it displayed normal platelet levels (340,000).[3] There is no record as to why this testing was deemed necessary. The physical examination of C.L.'s skin did not reveal any bruising.

C.L. was seen again by Dr. Heimback-Graham for a sick visit on March 21, 2014. Petitioner reported that C.L. was irritable, pulling at her diaper, "clingy", and had a 101-degree fever earlier that morning. Ex. 2 at 42. Dr. Heimback-Graham diagnosed C.L. with an unspecified fever and dysuria, and she recommended petitioner administer Tylenol for fevers above 101 degrees. No complaints of abnormal bruising were reported during the visit.

On June 2, 2014, at a sick visit, C.L. was seen by Dr. Heimback-Graham for excessive bruising lasting two weeks and small red dots on various parts of her body for the week. Ms. Loyd stated that C.L. stumbled into a baby gate two weeks prior to the appointment, leaving bruises along C.L.'s face and forehead. C.L.'s platelet count was significantly decreased at 23,000, but all other blood indices were normal.[4] During this visit, Dr. Heimback-Graham diagnosed C.L. with severe immune thrombocytopenic purpura ("ITP") of unknown etiology and referred C.L. to Dr. Hardeo Panchoosingh, a hematologist at Baycare Pediatric Hematology.

---

[3] The blood test revealed normal white blood cell (9.2 K/cumm), hemoglobin (11.4 gm/dL), hematocrit (35.1%), and platelet levels (340,000). *Id.* at 38, 40; Tr. at 112-13, 159, 167-68.

[4] A blood test for platelet levels is a significant diagnostic tool for ascertaining the presence of ITP.

3

Dr. Panchoosingh evaluated C.L. that same day, at which time petitioner reported a two or three-week history of bruising. A physical examination revealed mild, scattered ecchymosis[5] and petechiae.[6] *Id.* at 7. Based on these observations and the CBC results, Dr. Panchoosingh agreed that C.L.'s clinical picture was most consistent with post-viral ITP. Dr. Panchoosingh recommended monitoring C.L.'s condition, and that she return for a follow-up appointment in three days.

A repeat platelet count was conducted on June 5, 2014, showing a low result of 9,600. C.L. was admitted to Baycare Pediatric Hematology for a follow-up CBC, which showed an increased platelet count of 18,000. C.L. was discharged home with instructions to return a few days later for a follow-up platelet count.

On June 9, 2014, C.L.'s platelet count was documented as 1,000 and 8,000, and she was again admitted to Baycare Pediatric Hematology for intravenous immunoglobulin ("IVIG") treatment. Following this IVIG treatment, C.L.'s platelet counts improved to 184,000 on June 12, 2014, but then continued to decline to 33,000 on June 19, 2014 and to 21,000 on June 26, 2014. C.L. was admitted for another round of IVIG on July 7, 2014 after presenting with a platelet count of 12,000. During this admission, C.L.'s family history was noted as significant for "ITP in paternal [grandmother] and von Willebrand disease in paternal aunt who experienced thrombocytopenia during pregnancy." Ex. 115 at 14. C.L. was discharged on July 8th, and on July 17th C.L.'s platelet count had improved to 35,000. Petitioner was advised, however, that C.L.'s recurrent ITP would likely require other therapies in the future.

C.L.'s next platelet count on July 22, 2014 showed continued improvement at 42,000, but those levels again decreased to 15,000 on August 4th and 11th, and 11,000 on August 25, 2014. Ex. 4 at 34, 41, 48. At her follow-up visit on August 4, 2014, Dr. Dana Obzut, M.D., another one of

---

[5] "Ecchymosis is a 'small hemorrhagic spot, larger than petechiae, in the skin or mucus membrane forming a nonelevated, rounded or irregular, blue or purplish patch.'" *Loyd v. Sec'y of Health & Human Servs.*, No. 16-811V, 2021 WL 2708941, *7 (Fed. Cl. Spec. Mstr. May 20, 2021) (quoting *Dorland's Illustrated Medical Dictionary* 579, 582 (33d ed. 2020)).

[6] "A petechiae is 'a pinpoint, nonraised, perfectly round, purplish red spot caused by intradermal or submucous hemorrhage.'" *Id.*

4

C.L.'s treating hematologists, noted that C.L. seemed to require IVIG treatment on a monthly basis, but she was only experiencing improvements in her platelet count for two weeks before her condition deteriorated again. Dr. Obzut noted that Ms. Loyd was concerned about the chronic nature of C.L.'s condition and wanted to know more about future treatment options. Petitioner and C.L.'s treating hematologists opted for an observational approach, and no further treatments were administered during these visits.

C.L. continued to obtain treatment for her chronic ITP, with platelet levels remaining persistently low. Ex. 28 at 50 (August 2017 treatment). At times, IVIG treatment was discontinued because C.L. developed aseptic meningitis from the treatment. *Id.* She tested positive for an anti-platelet antibody, and treaters proposed a "possible underlying immune dysregulation" to explain C.L.'s persistent chronic ITP. *Id.* at 41, 46. She received treatment and evaluation many times in this regard, but no conclusive determinations have been made. It also was proposed by some treaters that C.L. might be in the early stages of development of lupus erythematosus, although she did not meet the precise diagnostic requirements.

II. Procedural History

On July 18, 2016, Ms. Loyd, on behalf of her minor child C.L., filed a petition seeking compensation under the National Childhood Vaccine Injury Act. Petitioner alleges that, after receiving the second doses of the haemophilus influenza type b ("Hib") and pneumococcal conjugate ("PCV") vaccines, administered on August 30, 2013, C.L. developed ITP caused by those immunizations.

After several years developing the record, including the parties' retaining experts, on October 29, 2020, the Special Master held an entitlement hearing in Washington, D.C. (via remote/video participation). *Loyd v. Sec'y of Health & Human Servs.*, No. 16-811V, 2021 WL 2708941, *1 (Fed. Cl. Spec. Mstr. May 20, 2021). C.L's medical records, medical literature, and expert reports were filed before and after that hearing. During the hearing, petitioner presented the expert testimony of M. Eric Gershwin, M.D., and respondent presented that of John Strouse, M.D., Ph.D. and Andrew MacGinnitie, M.D., PhD. In addition, petitioner presented a letter from David Berger, M.D., one of C.L.'s treating physicians, as evidence in support of petitioner's claim, and she also filed six color photographs of C.L.

5

purporting to establish clinical manifestations of the bruising and petechiae associated with ITP.

III. Expert Testimony

We begin with petitioner's expert, Dr. Gershwin, and then consider the testimony of respondent's two experts.

A. Dr. Gershwin

Dr. Gershwin is an immunologist and has evaluated both adult and pediatric patients. Dr. Gershwin received his bachelor's degree from Syracuse University in Syracuse, New York, followed by his medical degree at Stanford University. Dr. Gershwin Curriculum Vitae, filed as Ex. 18 on Aug. 7, 2017 (ECF No. 41) ("Gershwin CV"). He then completed his internship and residency at Tufts–New England Medical Center in Boston, Massachusetts. *Id.* at 2. He completed a fellowship in immunology with the National Institute of Health and later became an Assistant Professor in Rheumatology and Allergy at the University of California, School of Medicine in Davis, California.

He is now semi-retired and continues to work on a "callback" basis at the University of California, School of Medicine in Davis providing consultations for rheumatology and immunology patients. He currently serves as the editor-in-chief of the Journal of Autoimmunity as well as two other publications focusing on autoimmunity. Although he is not a hematologist, he has had occasion to evaluate patients with ITP and estimates that he sees approximately five or six ITP patients a year.

Dr. Gershwin began by defining ITP as an immune-mediated disease that causes platelet destruction and is characterized diagnostically by low platelet counts. He also discussed the diagnosis and causes of ITP. A diagnosis of ITP can only be confirmed with a platelet count, but observations of bruising may be helpful in arriving at this diagnosis. Studies of ITP's cause have identified a vast number of potential etiologies, such as quinine and other drugs, immune deficiencies, wild rotavirus, H. pylori bacterial infections, and even some vaccines. Dr. Gershwin specifically highlighted reports of ITP following the MMR, Diphtheria/Pertussis/Tetanus ("DPT"), Prevnar, and rotavirus vaccines.

Dr. Gershwin explained the concept of molecular mimicry to demonstrate how vaccines can cause ITP. Molecular mimicry can occur when a vaccine antigen appears like "something on the membrane of the platelet" and there is subsequent cross-reactivity between antibodies targeting the vaccine antigen and the platelets. Dr. Gershwin emphasized that vaccine antigen and platelet cells do not have to be identical for molecular mimicry to occur, but they do require some combination of sequential, structural, and special homologies. He also explained that molecular mimicry is considered a plausible explanation for the pathogenesis of ITP. Although Dr. Gershwin theorized that any vaccine could potentially cause ITP, he noted that certain vaccines, including MMR, DPT,[7] and Prevnar, are more likely causally related than others. Thus, he focused his causal opinion on C.L.'s second dose of Prevnar, rather than Hib.

By way of explanation for a mechanism of how Prevnar causes ITP, Dr. Gershwin stated that individuals respond in different ways to vaccination or infection. Therefore, Prevnar could cause chronic ITP because of variable immunologic responses. Genetic diversity makes it difficult to predict how any given individual will respond to infection or vaccination according to Dr. Gershwin. In some individuals, the immune response may reach "an avidity or affinity" such that the production of certain antibodies becomes permanent. Tr. at 111. Alternatively, in the case of determinant spreading, the initial autoimmune cross-reaction will "mature and change," perpetuating an ongoing autoimmune response. *Id.* at 112.

Dr. Gershwin admitted that little direct evidentiary support exists of a relationship between Prevnar and ITP, though he noted that a prescriber reference indicated an association between the Prevnar vaccine and relapses in previously stabilized ITP patients. Tr. at 65-66, 103-04, 184 (citing Prescriber's Digital Reference, Pneumococcal Vaccine Polyvalent – Drug Summary, https://pdr.net/drug-summary/Pneumovax-23-pneumococcal-vaccine-polyvalent-373 (last visited Apr. 9, 2021), filed as Ex. 8 on June 22, 2017 (ECF No. 24-3) ("PDR")). The PDR notes that treaters administering the PCV vaccine should do so with caution in patients who had already been diagnosed with ITP, because the vaccine "has been associated with relapse of this condition." PDR at 5.

---

[7] Dr. Gershwin compared the Prevnar vaccine to the DPT vaccine, which is known to cause ITP, and explained that Prevnar could also cause ITP because both DPT and Prevnar contain diphtheria proteins.

He first noted that C.L. did not appear to have any significant medical issues before receiving her August 2013 vaccinations.  He was persuaded by the photographs provided by Ms. Loyd (discussed below) that C.L. likely had experienced unexplained bruising long before her ITP diagnosis—probably beginning in September 2013.

Dr. Gershwin also focused on Ms. Loyd's testimony that C.L. was "not herself" after her vaccinations.  He opined that although it is common for vaccinations to cause fever and malaise, fatigue is associated with ITP— though Dr. Gershwin provided no support for this associated symptom.  He speculated that fatigue could be the result of immune-mediated inflammation, indicating that such an association has been described in scientific and medical literature.  Dr. Gershwin further contended that although Ms. Loyd's reports of abnormal bruising were not documented in the medical record, the fact that a CBC was ordered on February 3, 2014, suggests that Ms. Loyd did report concerns of bruising.  He again conceded, however, that the medical record does not include any documentation relating to bruising at this time, and in fact indicates that there were "[n]o parent concerns."  Tr. at 107.

Dr. Gershwin had difficulty explaining the normal CBC platelet count that C.L. displayed in February 2014—a little more than five months after vaccination.  The record clearly established the CBC panel ordered at Ms. Loyd's request revealed a normal platelet level of 340,000.  Dr. Gershwin contended, however, that ITP can have a waxing and waning course— especially if the patient is experiencing a concurrent infection or fever.

He did admit that the drop in C.L.'s platelet levels from 340,000 in February 2014 to 23,000 in June that same year was particularly dramatic. But he maintained that such a significant drop in platelet levels is consistent with ITP, especially "in the presence of the viral infection" such as the one C.L. experienced in February 2014.  *Id.* at 112-13.  In the absence of infections, Dr. Gershwin would not expect to see such dramatic variance in platelet levels, even when a patient experiences a waxing and waning symptom pattern.

C.L.'s medical record from her next sick visit, in March 2014, lacks any documentation of ITP-related symptoms or concerns.  Ex. 2 at 42-44. Dr. Gershwin opined that this omission was likely because C.L.'s pediatrician hadn't "figured [it] out yet," but he later acknowledged that

8

C.L.'s ITP was not clinically obvious during this visit. Tr. at 79-80. Only in June 2014 did C.L.'s symptoms became apparent to her pediatrician, and it was shortly thereafter that she received her ITP diagnosis. Though C.L. was initially diagnosed with "acute" ITP, Dr. Gershwin explained that her overall course—which has lasted for more than six months—is more consistent with chronic ITP. *Id.* at 109-10. Dr. Gershwin also emphasized the pediatrician's note indicating "patient cannot receive immunizations at this time," adding speculatively that Dr. Heimback-Graham likely would have identified Prevnar as the cause if the association was better known. *Id.* at 81-82.

Dr. Gershwin also noted the medical record shows that in March 2014, C.L. had symptoms consistent with an upper respiratory infection. Remission of ITP, or an increase in platelet levels, due to an intercurrent infection can last for several weeks and may be attributable to changes in the "avidity or affinity of the antibody…or the cytotoxic T cells." Tr. at 79, 98. He again referenced the existence of studies to support this theory but did not provide specific citations to that literature. Dr. Gershwin later admitted, however, that there are no studies describing the timeframe for waxing/waning of ITP due to intercurrent infection, and that the "kinetics" associated with T cell involvement is not currently known. *Id.* at 100. He thus could not say with certainty whether any upper respiratory infection C.L. had been experiencing at this time would have raised C.L.'s platelet levels (although the record does show that C.L. likely had an upper respiratory infection in mid-January of that year). Indeed, he conceded that it is not possible to predict whether an upper respiratory infection will actually produce waxing or waning of platelets in ITP patients. Nothing else he specifically cited, in his report or at trial, suggests that levels of platelets could drop at the onset of ITP and then swing back to a robust and fully normal level months later, only to thereafter drop precipitously again.

In conclusion, Dr. Gershwin opined that the onset of C.L.'s chronic ITP likely occurred within a few weeks of her August 2013 vaccination, a timeframe he deemed medically acceptable. He relied on Ms. Loyd's testimony and the photographs she took of C.L.'s bruising, beginning purportedly in September 2013. He agreed, however, that if onset was found to have occurred any time between January and June 2014 (five to ten months after vaccination), a causal relationship with the August vaccinations would not be supported.

B.  Dr. Strouse

9

Respondent's expert, Dr. Strouse, a practicing pediatric hematologist, provided four reports and testified at the entitlement hearing. Dr. Strouse received his bachelor's degree from Princeton University before obtaining his medical degree and Ph.D. from Johns Hopkins University School of Medicine and Public Health. Dr. Strouse Curriculum Vitae, filed as Ex. B on Dec. 5, 2017 (ECF No. 32-2). He completed his residency training in pediatrics at the University of Rochester and then completed a fellowship in pediatric hematology and oncology at the National Institutes of Health and Johns Hopkins University.

Dr. Strouse is a temporary instructor in medicine and pediatrics at the Duke University School of Medicine, is board certified in pediatric hematology and oncology and has extensively published on topics within those fields. In addition to his teaching duties, Dr. Strouse spends approximately forty percent of his time in clinical practice, with about half of his patients presenting with sickle cell anemia and the other half presenting with various blood disorders. Of these, Dr. Strouse diagnoses approximately ten cases of ITP a year.

Based upon his review of the medical record and supporting literature, Dr. Strouse opined that C.L.'s chronic ITP was more likely than not unrelated to the vaccines she received in August 2013. Dr. Strouse Expert Report, filed as Ex. A on Dec. 5, 2017 (ECF No. 32-1) ("First Strouse Rep."); Tr. at 125. Dr. Strouse began by describing ITP as a condition in which an individual's blood platelet count falls below 100,000 without any other identifiable cause. The onset of chronic ITP can be insidious, making it difficult to diagnose, and etiologies are rarely identified. Dr. Strouse allowed, however, that immune challenges, including vaccination, can trigger its onset. Patients suffering from ITP may present with bruising, and children can also have fatigue (as Dr. Gershwin maintained), but blood tests are ultimately required to make a formal diagnosis.

Dr. Strouse began with C.L.'s medical history. First, he stated that there was no evidence C.L. was suffering from ITP prior to receiving her August 2013 vaccinations. Further, between August 2013 and June 2014, the medical record was devoid of any evidence that C.L. was experiencing symptoms of ITP, despite having seen her pediatrician on several occasions during this timeframe. Not until June 2, 2014, were there any recorded symptoms that Dr. Strouse deemed consistent with ITP. From that point on, the records showed no instances in which C.L.'s platelets ever returned to a normal range. Thus, although Dr. Strouse agreed that C.L.'s initial

10

presentation was acute, her overall illness was best characterized as chronic because her ITP has persisted for more than twelve months.

Dr. Strouse took issue with the intercurrent infection component of Dr. Gershwin's theory for C.L.'s normal platelet count when measured in February 2014.  Tr. at 126, 139-40.  Although Dr. Strouse generally agreed that viral infections can stimulate platelet production, he noted that this only occurs when there is "an incredibly powerful inflammatory stimulus," not likely induced by the typical upper respiratory infection suffered by C.L.  Second Strouse Report at 1, filed as Ex. I on Apr. 12, 2018 (ECF No. 41-1) (citing M. Vranou et al., Recurrent Idiopathic Thrombocytopenic Purpura in Childhood, 51 Pediatric Blood Cancer 261, 263 (2008), filed as Ex. J on Apr. 12, 2018 (ECF No. 41-2)).  Moreover, an exponential increase in platelet levels like that experienced by C.L. "would be quite unusual."  Tr. at 141.  Indeed, Dr. Strouse noted that he had never seen such a wildly divergent wax/wane pattern in all his years of clinical practice as a hematologist.  He disagreed with Dr. Gershwin's theory that C.L.'s February 2014 platelet count represented spontaneous remission, only to be followed by a subsequent relapse in her symptoms manifesting in the spring, and thus he did not accept that onset began in September 2013.

The onset of C.L.'s ITP, according to Dr. Strouse, likely did not occur before May 2014, prior to the June 2014 pediatric visit.  If C.L.'s onset of ITP began in September 2013 as Dr. Gershwin purported, Dr. Strouse would have expected to see evidence of bruising and low platelet counts documented in the contemporaneous medical record.  The record, however, does not describe any concerns for bruising until long after, and instead indicates that C.L.'s platelet levels were normal in February 2014.

Dr. Strouse also reviewed and discussed the photographic and anecdotal evidence Dr. Gershwin relied on to support a September 2013 onset.  He found that the photographic evidence was not clear.  While he agreed that the photos showed bruises of some kind, he could not conclude they were the result of any pathology, adding that none of the photos clearly demonstrate petechiae.  He emphasized that unexplained bruising in young children is fairly common, can be highly variable, and are often observed on the head and legs given the activities of young children, and that this could explain the photo evidence.  He noted that it was not unusual that there was an apparent lack of antecedent events to explain each bruise.

After reviewing petitioner's proffered medical literature, which described the waxing and waning nature of ITP, Dr. Strouse highlighted that spontaneous remission was not observed in any of the study participants. He also distinguished the study, stating that the waxing and waning patterns described were not equivalent to the dramatic fluctuations that would necessarily have occurred under petitioner's theory. Although Dr. Strouse allowed that immune stimulation might in some cases cause platelet levels to increase from 30,000 to 50,000, he stated it would not result in the ten-fold increase that would be necessary to make sense of the February 2014 CBC results.

### C.  Dr. MacGinnitie

Respondent's second expert, Dr. MacGinnitie, a pediatric immunologist, offered two expert reports and testimony at the entitlement hearing. Dr. MacGinnitie received his undergraduate degree from Yale University, followed by both a medical degree and Ph.D. from the University of Chicago. He thereafter completed his residency, followed by a fellowship in allergy and immunology at Boston Children's Hospital. Dr. MacGinnitie is an attending physician and the Clinical Director for the Division of Immunology at Boston Children's Hospital in Boston, Massachusetts. He is also an Associate Professor of Pediatrics at Harvard Medical School. He is board certified in pediatrics and allergy and immunology and has been in practice as an allergist/immunologist since 2004. Ninety-five percent of his patients are children, and he estimated that he spends two-thirds of his time treating patients in a clinical setting.

Dr. MacGinnitie's research focuses on food allergies, and he serves on the editorial board of the journal Annals of Allergy, Asthma and Clinical Immunology. Dr. MacGinnitie's experience with ITP patients is limited to treating their underlying or concurrent immune deficiencies.

Dr. MacGinnitie opined that C.L.'s chronic ITP was unrelated to receipt of the Prevnar vaccine. Tr. at 166. He accepted that the pathogenesis of ITP involves an autoimmune process, even if the exact cause of ITP remains unknown. He also allowed that some vaccines, such as the MMR vaccine, are reliably associated with ITP, but strenuously contested Dr. Gershwin's contention that any vaccine, including Prevnar, could be assumed to cause ITP.

To support his position, Dr. MacGinnitie highlighted facial distinctions between what is known about the vaccines that are considered likely causal of ITP and Prevnar. Wild measles infections, for example, are associated with the development of ITP, lending support to the idea that the MMR vaccine might similarly be causal. But wild S. pneumoniae infections are not known to increase the risk of developing ITP. In addition, differences in vaccine formulation were relevant to causality in Dr. MacGinnitie's view. The MMR vaccine is a live attenuated vaccine containing live fragments of the wild virus, whereas the Prevnar vaccine is a "subunit" vaccine containing pneumococcal bacteria components that cannot replicate. And there is a lack of epidemiological evidence persuasively linking either the Prevnar or Hib vaccine to the development of ITP, unlike the MMR vaccine. Dr. MacGinnitie therefore cautioned against applying what is known about ITP following the MMR vaccine to a distinguishable vaccine.

Dr. MacGinnitie next explained that, in order for petitioner's molecular mimicry theory to be reliably applied as explaining a disease caused by vaccination, there should be evidence of (a) homology between the presenting antigen and a human protein, and (b) some actual cross-reactivity. Homology alone is not enough to reliably predict cross-reactivity, given the prevalence of amino acid sequence homology in proteins throughout the body.

Even with such naturally occurring homology, however, autoimmune disease remains rare. Rather, self-regulating mechanisms in the immune process naturally protect against autoimmunity. Thus, in Dr. MacGinnitie's view, Dr. Gershwin's theory flies in the face of the low likelihood generally of pathologic autoimmunity, especially in the absence of proof that cross-reactivity would be triggered by Prevnar. Indeed, Dr. Gershwin did not even attempt to identify homologies between any component of the Prevnar vaccine and blood platelets, rendering his molecular mimicry conclusions especially speculative.

After reviewing the medical record, Dr. MacGinnitie concluded that C.L. did not have ITP as of February 2014 when her CBC revealed a platelet count within normal limits. Though he agreed that the photographs taken by Ms. Loyd in September 2013 and thereafter showed some evidence of bruising, Dr. MacGinnitie did not observe petechiae, and he opined that this bruising was therefore likely typical for a child her age. Instead, and consistent with Dr. Strouse, Dr. MacGinnitie proposed that onset of C.L.'s

13

ITP occurred in May 2014, just prior to the incident where C.L. fell into the baby gate and developed distinctive bruising.

Dr. MacGinnitie further disputed petitioner's theory that C.L.'s ITP course had waxed and waned over many months post-vaccination. He observed that C.L.'s platelet levels never once rebounded after they were documented within the normal range in February 2014. He further stated that any fluctuations she might have experienced were minor and did not reflect rebounds of a hundred thousand platelets or more. The record, which showed consistently low platelet levels after June 2014, was most consistent with the conclusion that onset occurred not long before that date. For Dr. MacGinnitie, the eight-month period between C.L.'s August 2013 vaccination and likely onset in May 2014 was simply too lengthy to associate the vaccine with the first confirmed record evidence of ITP.

## IV. Other Evidence

### 1. Treating Expert

Dr. Berger, one of C.L.'s treating physicians, offered a letter in support of Petitioner's claim, but he did not testify at the entitlement hearing. Dr. Berger Letter, filed as Ex. 9 on July 14, 2017 (ECF No. 26-1). The filed record establishes that Dr. Berger first treated C.L. in September 2015. Dr. Berger opines in his letter that the onset of C.L.'s ITP likely occurred in early September 2013. This conclusion was largely based, however, on conversations Dr. Berger had with Ms. Loyd and the photographs she provided. Relying on this conclusion and case reports of ITP following vaccination, Dr. Berger opined that C.L.'s condition was more likely than not the result of the Prevnar vaccine she received in August 2013.

### 2. Photographic Evidence

Prior to the entitlement hearing, petitioner filed six color photographs of C.L. purporting to establish clinical manifestations of the bruising and petechiae associated with ITP, which she discussed at trial.[8]  Tr. at 11-15;

---

[8] The first photograph Ms. Loyd discussed purportedly shows a bruise on C.L.'s forehead when she was approximately seven-and-a-half months old. Tr. at 11; Ex. 6 at 1. The second photo, dated September 13, 2013, is a magnified view of a bruise. Tr. at 12; Ex. 6 at 2. The next photograph, dated September 18, 2013, shows tiny bruises, which petitioner later learned were

Ex. 6, filed June 22, 2027 (ECF No. 24-1).  Ms. Loyd testified that she took these photos and showed them to C.L.'s pediatrician, Dr. Heimback-Graham during her December 2013 visit.  That discussion was not documented in the medical record, however.  Petitioner maintains that Dr. Heimback-Graham dismissed her concerns.  After the entitlement hearing, Petitioner filed three exhibits of photographs appearing to show bruising on C.L.'s head and feet.[9] Photographs, filed as Exs. 124-26 on Nov. 6, 2020 (ECF No. 78).

## VI. The Special Master's Decision

After reviewing the medial records, testimony, expert reports, and submitted scientific literature, the Special Master found that petitioner did not meet her burden.  Specifically, the Special Master found that Dr. Gershwin was unable to demonstrate that the onset of C.L.'s symptoms occurred within a medically appropriate timeframe to infer a causal relationship with her 2014 vaccination.  *Loyd,* 2021 WL 2708941 at *72-81.

It was undisputed that an onset beyond five months post vaccination would have precluded the finding of causation.  Because the Special Master found that the timing of onset is paramount to the disposition of this case, he addressed the issue first.  He found that the medical record supports an onset close in time to the discovery of C.L.'s low platelet levels in June 2014.  The Special Master highlighted that, although C.L. was seen regularly by her physician between August 2013 and June 2014, the medical record did not

---

called petechiae. Tr. at 12-13; Ex. 6 at 3.  A photograph dated October 25, 2013, shows more bruising that appeared when C.L. was approximately eight months old and was trying to walk while holding onto surfaces. Tr. at 14; Ex.6 at 3.  The last photograph, dated November 23, 2013, shows blood under a fingernail purported to be C.L.'s. Tr. at 15; Ex. 6 at 4.  Ms. Loyd explained that these bruises appeared spontaneously.

[9] While the Special Master considered the photographs in Exhibits 6 and 124-26, he noted that they were not formally authenticated, temporally or otherwise.  Additionally, he stated that many of the photos do not have a time stamp or other metadata indicator confirming they were taken at the dates alleged.  At most, some of the photos have hand-drawn circles and dates (appearing to have been digitally applied by the Petitioner herself), and this coupled with her affidavit, in which she briefly mentions taking photographs of C.L.'s bruises is how petitioner would establish their authenticity.  Tr. at 13; Affidavit at 1-2.

show that C.L. experienced bruising or a low platelet count until late May or early June. Most important to the Special Master was the fact that unrebutted medical record proof establishes that C.L. had normal platelet counts (the 340,000 count from the February 2014 CBC test) several months prior to the reported bruising, low platelet count, and subsequent June 2014 ITP diagnosis. *Id.* at *74.

Petitioner explained the high platelet count in February 2014 by a waxing and waning, which she speculates started in September 2013. For her theory to be valid, petitioner would need to demonstrate that C.L.'s surmised lowered platelet levels began in the early fall of 2013, then rebounded dramatically when tested in February 2014, only to drop again when tested a second time in June 2014. The Special Master found that petitioner's explanation was highly unlikely based upon what is known about the progression of chronic ITP[10] and how C.L.'s own condition had progressed after June 2014 (her platelet levels never appear to have again gone into normal levels, despite some fluctuation at a lower-than-usual level). *Id.*

The Special Master was not persuaded by Dr. Gershwin's explanation that C.L.'s respiratory infection might have caused a temporary rebound in platelet levels in February 2014. He determined that petitioner offered insufficient reliable evidence to conclude, as alleged, that a viral infection would likely cause a tenfold platelet increase equivalent to C.L.'s documented February 2014 platelet count of 340,000. He found that Dr. Strouse's opinion undercut petitioner's argument. Dr. Strouse established that any transient platelet increase attributable to intercurrent infection would not result in the dramatic swing toward normal levels proposed herein. Additionally, respondent's experts established that platelet level fluctuations occur, but only in narrow ranges—with differences of 10-20,000, but not the much larger increase displayed by C.L.'s normal platelet levels in February 2014.

He found that the three studies offered to support this theory describe conditions giving rise to thrombocytosis, a condition that causes abnormally

---

[10] The Special Master noted that Acute ITP generally resolves within three months. *Loyd,* 2021 WL 2708941 at *69 (*citing* V. Cecinati et al., *Vaccine Administration and the Development of Immune Thrombocytopenic Purpura in Children*, 9 Hum. Vaccines & Immunotherapeutics 1, 2 (2013), filed as Ex. 16 on July 14, 2017 (ECF No. 26-8)). He also noted that ITP is deemed to be chronic when it lasts longer than twelve months. *Id.*

high platelet levels. The studies, however, do not discuss how respiratory infections influence platelet levels in patients concurrently experiencing ITP. Dr. Gershwin, in effect, conflated ITP with thrombocytosis, which causes the opposite symptom as ITP, leaving an unsupported diagnosis here.

He found that two other issues also undermine petitioner's contention that a large variation in platelet levels is characteristic of chronic ITP. First, as Drs. Strouse and MacGinnitie observed, C.L.'s platelet levels never returned to a normal range after receiving her official diagnosis in June 2014. This low platelet level course is not at all consistent with the fluctuations Petitioner argues C.L. was experiencing prior to this time, and instead evinces the kinds of limited-range platelet level variances that would be characteristic of a case of chronic ITP that began around the May-June 2014 period, not long before. Second, Petitioner's theory amounts to the argument that C.L. experienced a spontaneous remission in the winter of 2014—something that petitioner's proffered medical literature notes is highly uncommon.

The Special Master found that petitioner's onset allegations relied heavily on her own testimony, fortified with the photos she offered. Ultimately, he found that petitioner's testimony and photographic evidence was not enough to satisfy her burden of proof. Though he found that the photographs do provide evidence that C.L. had some isolated bruises in the Fall of 2013, the photographs were not sufficiently detailed or sharp enough to assess the extent of bruising or to evaluate its clinical significance, and thus do not establish onset. He also noted that respondent's experts agreed that the images did not demonstrate the petechiae or "significant" bruising that would be characteristic of ITP, in their medical experience. *Id.* at *79.

The Special Master also highlighted that no medical records before June 2014 memorialize concerns about bruising. He concluded that even if petitioner did express concerns about unexplained bruising at that time, any testing that may have resulted established that C.L. was not then suffering from ITP. Thus, the Special Master concluded that the medical record supports an onset close in time to the discovery of C.L.'s low platelet levels in June 2014.

Having dealt with the issue of onset, the Special Master applied that finding to the third *Althen* prong, which requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. He found that petitioner did not establish a

17

proximate temporal relationship between vaccination and injury here. Particularly instructive to his finding was Dr. Gershwin's concession that an onset of five to ten months post-vaccination would not be medically acceptable for purposes of proving vaccine causation. Second Gershwin Rep. at 1 ("[i]f indeed the onset was not until five months post-vaccination, then I would agree with [Dr. Strouse's] assessment" that C.L.'s vaccinations were not associated with her ITP). Thus, the Special Master's determination that onset did not occur until May 2014, at least eight months post-vaccination, means that a proximate temporal relationship between vaccination and injury cannot be met.

Similarly, the Special Master found that petitioner failed to establish the second *Althen* prong, preponderant evidence of a logical sequence of cause and effect connecting the vaccine at issue to the alleged injury. *Althen v. HHS*, 418 F.3d 1274, 1278 (Fed. Cir. 2005)). The medical record evidence, including petitioner's testimony and photos, he found insufficient to suggest that C.L. had begun to experience what would later be diagnosed as chronic ITP any time within four to five months post-vaccination (i.e., before February 2014). He also found a lack of proof suggesting any kind of autoimmune process was underway in this timeframe. Further, he noted that the first blood test that could have revealed a subacute or insidious ITP process, from February 2014, was unsupportive of the diagnosis. He thus found that the record lacked persuasive or reliable evidence suggesting that C.L.'s chronic ITP was in fact likely caused by the August 2013 second dose of Prevnar. *Loyd,* 2021 WL 2708941 at *82.

Finally, the Special Master found that petitioner did not establish *Althen* prong one, which requires petitioner to provide a "reputable medical theory," demonstrating that the vaccine received can cause the type of injury alleged. *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006) (citations omitted). He was not persuaded by Dr. Gershwin's general theory that the Prevnar vaccine can cause ITP. *Loyd,* 2021 WL 2708941 at *85-86. He found that petitioner failed to establish molecular mimicry as a reliable scientific explanation of causation, linking the Prevnar vaccine to C.L.'s ITP. He further noted that the medical literature proffered by petitioner, including epidemiological studies, did not show an increased risk of developing any form of ITP following vaccination with Prevnar.

In summary, the Special Master found that the medical theory proposed by petitioner was not adequately supported by expert testimony and

18

was contradicted by more credible expert testimony from respondent's doctors that the medical literature used to support petitioner's theory was unreliable, and that C.L.'s medical record and test results were not consistent with petitioner's claims. We find no error in these conclusions, as discussed below.

DISCUSSION

This court has jurisdiction to review the Special Master's decision in accordance with 42 U.S.C. § 300aa-12. Our review is deferential, only permitting decisions to be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." *Id.* § 300aa-12(e). When the Special Master has considered the relevant evidence and articulated a rational basis for the decision, reversible error is "extremely difficult to demonstrate." *Hines v. Sec'y Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991). This court does "not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses–these are all matters within the purview of the fact finder." *Porter v. Sec'y of Health & Human Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011).

Under the Act, a petitioner may seek compensation for "any illness, disability, injury, or condition" sustained or significantly aggravated by a vaccine. 42 U.S.C. §§ 300aa-11(c)(1), -13(a)(1)(A). When a petitioner seeks compensation for an injury caused by a vaccine other than those injuries listed on the Vaccine Injury Table in the Federal Register, petitioner must prove causation in fact. *Althen*, 418 F.3d 1274, 1278 (Fed. Cir. 2005) (citing 42 U.S.C. § 300aa-13(a)(1)(A)). In these "off table injury" cases, petitioner must show that the vaccination caused the injury by proving three elements by a preponderance of the evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* These three elements are referred to, respectively, as *Althen* prongs one, two, and three.

A different showing corresponds to each of the elements, but the same evidence may be used to prove more than one element. First, petitioner must provide a reputable medical theory that demonstrates that the vaccine can cause the alleged injury. A petitioner is not required to submit medical literature, propose a generally accepted theory, or demonstrate proof of scientific certainty. *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d

19

1367, 1378 (Fed. Cir. 2009). Yet, petitioner cannot prevail merely on "a 'plausible' or 'possible' causal link between the vaccination and the injury; he must prove his case by a preponderance of the evidence." *W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352,1356 (Fed. Cir. 2013) (citing *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1332 (Fed. Cir. 2010)). "[A] mere showing of a proximate temporal relationship between vaccination and injury" is insufficient to prove actual causation. *Althen*, 418 F.3d at 1278.

To demonstrate a logical sequence of cause and effect, petitioner may use reputable medical or scientific evidence, including medical records. *See Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1326 (Fed. Cir. 2006) (citations omitted). Additionally, the treating physician's opinion is entitled to weight, particularly because it was created contemporaneously. *Id.* Finally, petitioner must establish that there is a "medically-acceptable" timeframe between the vaccination and alleged injury that is consistent with the theory of how the vaccine could cause the injury. *De Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).

On review, petitioner argues that (1) the Special Master's finding that C.L.'s onset did not occur in September 2013 was arbitrary and capricious; (2) the Special Master erred by finding that petitioner did not meet her burden under *Althen* prong one. For the reasons given below, we find that the Special Master's decision was reasonable.

I. The Special Master's finding that onset of C.L.'s ITP more likely than not occurred in May 2014 was reasonable.

We begin where the Special Master did by addressing the chief dispute at issue, the timing of the onset. Although the parties agree that C.L. developed chronic ITP and that the condition was apparent at some time after C.L.'s August 2013 vaccinations, the date of onset is in dispute. The date of onset is dispositive on causation given petitioner's own expert's agreement regarding the medically appropriate time frame to link the vaccine to ITP. The parties propose competing dates of onset: petitioner contends that C.L. likely experienced onset no later than September 2013, about two weeks post-vaccination, while respondent argues that the onset of C.L.'s chronic ITP likely occurred in May 2014, when C.L.'s bruising was first noted in the medical record.

20

On review, petitioner argues that the Special Master's factual finding that the bruising that occurred in September 2013 was not the onset of ITP was arbitrary and capricious. In petitioner's view, the Special Master's analysis leaves no explanation for the bruising C.L. experienced. We disagree with the former and, as to the latter, find it immaterial.

The Special Master considered petitioner's testimony and her photographs of C.L.'s bruising from the Fall of 2013, but he found that this evidence did not establish onset of ITP because the photographs were not sufficiently detailed or sharp to assess the extent of bruising, or to evaluate its clinical significance. This was supported by respondent's experts who stated that the photographs did not show petechiae, a symptom associated with ITP. C.L.'s bruising thus could just as easily be attributed to common childhood bumps and bruises, an explanation accepted by respondent's experts and the Special Master, especially given their location on C.L.'s extremities. When presented with competing expert views of the same piece of factual evidence, the fact finder's weighing of that evidence is afforded great deference. Petitioner has not established why this conclusion was wholly without reason or otherwise arbitrary. Nor was there error in the fact that the Special Master's conclusion leaves unexplained the ultimate cause of the bruising in the pictures offered by Ms. Loyd. He was not required to explain the cause of C.L.'s bruising to determine onset. That was petitioner's burden, one he found unmet. There was no error in this regard.

Petitioner also avers that the Special Master's reliance on the record of C.L.'s platelet levels failed to consider her theory that a person suffering with ITP can present with normal platelet levels when faced with an acute immune challenge. Petitioner points to Dr. Gershwin's testimony that he had a patient who experienced normal platelet levels every time she was exposed to poison oak, proving that a patient can manifest normal platelet levels when exposed to an immune challenge. This testimony was unaddressed by the Special Master and thus constitutes an error, urges petitioner.

The Special Master did, however, consider Dr. Gershwin's theory but found respondent's expert's explanation of the facts more persuasive. The upper respiratory infection relied upon by Dr. Gershwin was explained by Dr. Strouse to be unlikely to cause the sort of immune response necessary to elevate C.L.'s platelets.[11] Once again, the Special Master was confronted

---

[11] Dr. Strouse's opinion established that any transient platelet increase attributable to intercurrent infection would not likely result in such a dramatic

21

with competing expert views of factual evidence.  The choice between them is not reversible error when that choice is supported by the record and explained in the decision, as here.  Beyond that, Dr. Gershwin's theory was questionable because the studies cited by petitioner only describe conditions giving rise to thrombocytosis—which causes a platelet hike—but do not discuss how respiratory infections influence platelet levels in patients experiencing ITP.

Petitioner's contention that the Special Master ignored Dr. Gershwin's testimony regarding his patient who went into remission when she was exposed to poison oak also fails, as the Special Master clearly addressed Dr. Gershwin's wax and wane theory as a whole.  He cited to Dr. Gershwin's testimony, which stated that he had a unique patient "who had severe thrombocytopenia and she would go in remission to normal platelet counts every time she got poison oak." Tr. at 78.  He clearly did not miss the import of that testimony and it was taken into consideration.  We note, once again, the injury involved there was not ITP.

We find no error in the Special Master's finding that the onset of C.L.'s chronic ITP more likely than not occurred in May 2014.  Although C.L. was seen regularly by her physician between August 2013 and June 2014, the medical record did not contain any complaints about bruising or low platelet levels prior to May or June 2014.  Instead, the medical record best supports the conclusion that onset was close-in-time to discovery of the low platelet levels in June 2014.  Additionally, the medical record establishes that C.L. had normal platelet counts (the 340,000 count from the February 2014 CBC test) several months prior to the reported bruising, low platelet count, and subsequent June 2014 ITP diagnosis.

Because an onset of eight to nine months after vaccination is inconsistent with petitioner's theory of causation, it can be determined on this alone that petitioner's claim fails without addressing the *Althen* test.  We address, however, petitioner's other argument regarding *Althen* prong one below.

---

swing toward normal levels. Respondent's experts established that platelet level fluctuations occur, but only in narrow ranges—allowing for differences of 10-20,000, but not the much larger increase that would have been necessary to account for C.L.'s normal platelet levels in February 2014.

II. The Special Master did not err by finding that petitioner's theory of causation was insufficient to satisfy *Althen* prong one.

Second, petitioner argues that the Special Master erred as a matter of law by finding that a plausible theory of causation was insufficient to satisfy the "medically reputable" requirement of *Althen* prong one. Specifically, petitioner takes issue with the Special Master's statement that although "it could be plausibly contended that other vaccines, like Prevnar, could cause ITP . . . the Federal Circuit has consistently rejected the contention that [*Althen* prong one] can be satisfied merely by establishing the proposed causal theory's scientific or medical plausibility." *Id.* at * 86 (citing *Boatman v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019)). Petitioner argues that this heightens the standard, as *Althen* prong one can be satisfied with a medically plausible or biologically plausible theory.

Petitioner misstates the law. To satisfy the evidentiary standard for prong one, petitioner must provide "proof by a preponderance of the evidence of a medical theory causally connecting" the vaccination with C.L.'s alleged injury. *Broekelschen v. HHS*, 618 F.3d 1339, 1350 (Fed. Cir. 2010). The Federal Circuit has explained that the causal connection requires more than mere plausibility. *E.g. LaLonde v. HHS*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) ("proof of a 'plausible' or 'possible' causal link… is not the statutory standard"). Petitioner seems to argue that the Special Master's statement that it could be plausibly contended that other vaccines could cause ITP confirms that she has met her burden under *Althen* Prong One. Petitioner, however, misreads this statement, as it should be read in the context of his discussion regarding prong one:

> There is also substantial evidence to support the proposition that some vaccines (in particular, the MMR vaccine) can play a causal role in the development of ITP. And the mechanism of molecular mimicry is not only a reliable scientific concept, but provides a likely explanation for how ITP may progress and/or be instigated by an infection or vaccination. Thus, it could be *plausibly* contended that *other* vaccines, like Prevnar, could cause ITP as well. Of course, it bears repeating: plausibility is *not* the evidentiary standard applicable to a petitioner's "can cause" showing. . . . As a result, causally associating Prevnar with ITP requires more than analogizing this case to what has been demonstrated to be preponderantly likely for different vaccines.

23

*Loyd,* 2021 WL 2708941 at *86 (internal citations omitted). In other words, the Special Master found that petitioner's mere mention of molecular mimicry does not satisfy the evidentiary standard. Petitioner was able to show that molecular mimicry is a mechanism for the progression of ITP and that some vaccines (like the MMR vaccine which has been shown to be causally related to the development of ITP) can play a role in the development of ITP. In order to link Prevnar to ITP, however, petitioner was only able to point out that Prevnar is also a vaccine. Beyond this, petitioner was unable to show any causal link between Prevnar and ITP.

Dr. Gershwin used molecular mimicry in an attempt to explain how the antigens in the Prevnar vaccine would initiate an autoimmune, cross-reactive attack on platelet levels. Beyond suggesting molecular mimicry as a mechanism for ITP, petitioner did not show that molecular mimicry likely does link the Prevnar vaccine to ITP. Petitioner did not establish that any component of the Prevnar vaccine has sufficient homology to induce cross-reactivity with blood platelets, thereby resulting in ITP. Additionally, none of the literature filed by petitioner, including epidemiological studies, found an increased risk of developing any form of ITP following vaccination with Prevnar. The Special Master reasonably found, therefore, that petitioner did not meet her burden, as it must be shown that the mechanism likely does link the vaccine in question to the relevant injury. *Yalacki v. HHS*, No. 14-278V, 2019 WL 1061429, at *34 (Fed. Cl. Spec. Mstr. Jan. 31, 2019), aff'd, 146 Fed. Cl. 80 (2019). It is unnecessary for us to review the Special Master's conclusion as to *Althen* prongs two and three.

## CONCLUSION

Because the Special Master did not err in finding that onset of C.L.'s chronic ITP more likely than not occurred in May 2014 and that petitioner's theory of causation was insufficient to satisfy *Althen* prong one, the petition was properly dismissed. Accordingly, petitioner's motion for review (ECF No. 86) is denied. The Clerk of Court is directed to enter judgment for defendant.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

24